CURRIER *v.* WEBSTER.

Where the mortgager of real estate has demanded of the mortgagee an account of the amount due upon the mortgage, such account must not only be seasonably rendered, but must be a just and true account, otherwise the mortgager may bring his bill in equity to redeem, or file his petition to have the amount justly due determined at the Trial Term of the Supreme Judicial Court, at his election.

Where an account rendered by a mortgagee contains certain items that are just and true, with others that are incorrect and unjust, the mortgager may tender the amount justly due, and rely upon his tender, but he is not compelled so to do, but may file his bill or petition, in order to have the true amount determined.

An error in the footing of such an account where all the items are given, and the computation is plain, and the mistake so evident that no one in the exercise of ordinary care could be misled by it, will not vitiate the account.

An action at law can be maintained by one partner against another partner in the same firm, upon an express promise made before the commencement of the partnership, in respect to advances to be made, or a common stock to be created, or a certain sum of money, or amount of property, agreed to be furnished by each in his individual capacity to constitute the capital of the company, for the carrying on of the business of the partnership.

Where an account has been rendered by the mortgagee or person having his interest, to the mortgager or person having his interest, and said account contains items which are incorrect and improper, and the mortgager brings his bill or petition, he will be entitled to his costs against such mortgagee or person holding his rights.

IN EQUITY. In the Bill, William A. Currier, of Exeter, in said ounc-ty of Rockingham, and John W. Currier, of East Kingston, in said county, complain against Benjamin F. Rowe and George B. Webster, both of East Kingston, aforesaid, William F. Sanborn, of Kingston, in said county, and George R. Perkins, of Sharon, in the county of Hillsborough, and say, that, on the fourth day of May, A. D., 1859, said Rowe, one Reuben W. Currier, and said W. A. Currier, entered into an agreement to purchase certain lands, mill privilege, and the mills thereon, situated in said Sharon, then owned and occupied by one William E.

Young, each to pay an equal share of the consideration therefor, and each to have an equal interest in said property and in the proceeds arising from the working of said mill; and, in pursuance of said agreement, said Rowe, R. W. Currier, and said W. A. Currier purchased said premises, and, on the same fourth day of May, 1859, received to themselves in fee simple a conveyance of said property from said Young for the consideration of eighteen hundred dollars, of which the sum of about nine hundred and twenty-five dollars was paid and secured to said Young, and the balance was to be paid to said George R. Perkins.

And the said grantees, on the same day, mortgaged the said premises to said Perkins to secure the payment of four notes, by them signed, bearing that date, and made payable to said Perkins or order, in bobbins. The first of said notes being for $275; the second for $200, payable Dec. 1st, 1859; the third for $200, payable Dec. 1st, 1860, and the fourth for $200, payable Nov. 1st, 1861. The said notes, with the payment to said Young, making up the full amount of the said consideration of $1800.

The first of said notes to said Perkins was paid by said grantees in equal shares, either in cash or in bobbins, or some other property belonging jointly to said promissors.

The said grantees, on the day of said purchase, took possession of said premises, and commenced running the same, the profits whereof were to be for their joint benefit in equal shares.

On the 7th day of May, A. D. 1859, said Reuben W. Currier conveyed his interest in said premises to his son, John W. Currier, one of the plaintiffs, for the nominal consideration of $600; but said conveyance was in fact a gift from said Reuben to said John, and the said John was to assume and pay all the liabilities of said Reuben in the premises.

On the 12th day of October, 1859, said W. A. Currier made a conveyance of all his legal title to said property to said John W. Currier, but his equitable interest did not pass by said deed, there being no consideration therefor; and the said conveyance being made as a matter of convenience, and for the sole and only purpose of enabling said John to make a legal title to the interest of said W. A. Currier in said premises to one Franklin T. Snow, who was proposing to purchase said premises; and, on the 29th day of the same October, said John W. Currier and said Rowe did convey the whole of said premises to said Snow in fee simple, for the consideration of $2000 paid and to be paid as follows: Said Snow paid in cash $400. and gave his two notes to said Rowe and John W. Currier—one for $400 and one for $600, secured by mortgages of said property; and further agreed to pay and take up the last three of the notes before mentioned, given by said R. W. Currier, Rowe and said W. A. Currier, to said Perkins, for $200 each, being the balance of said consideration of $2000.

Said Snow entered into possession of said premises, and occupied the same until about the time of the service of the writ of possession hereinafter mentioned, when he abandoned the same, and has never paid any part of his said notes to said Rowe and J. W. Currier; nor did he pay any part of the said notes to said Perkins, except the sum of $50, which

was endorsed on that which became due on the 1st day of December, 1859, under the date of Dec. 21st, 1859.

On the 11th day of December, 1860, a suit was brought by said Perkins against said W. A. Currier, said Rowe and R. W. Currier, upon one of said notes which became due Dec. 1st, 1860, which was entered and is still pending in the Supreme Judicial Court for the County of Cheshire, unless judgment has been rendered therein.

On the 18th day of August, 1860, said Perkins brought his writ of entry against said Snow, in the Supreme Judicial Court for the County of Hillsborough, to obtain possession of said premises under his said mortgage, which was duly entered in said Court; and such proceedings were had therein, that on the 4th day of September, A. D. 1861, a writ of possession issued out of said Court, upon which possession of said premises was delivered to said Perkins on the 20th day of November, 1861; a conditional judgment having been rendered in said suit on the 15th day of February, 1861, for $167.91 debt, and costs taxed at $12.08.

On the 20th day of November, A. D. 1861, said Perkins conveyed to said Webster and Sanborn all his interest in the said premises; and on the same day said Rowe conveyed to said Webster and Sanborn all his interest in the same. And said Perkins at the same time conveyed to said Webster and Sanborn all his interest in the note and suit in Cheshire County.

And the plaintiffs aver and believe that possession of said premises was taken under the said writ of possession for the purpose of enabling said Webster and Sanborn to hold the same by virtue of said mortgage, and to bar the plaintiffs from their rights in the same; and the said suit in Cheshire County has been, since said 20th day of November, prosecuted for the benefit of said Webster and Sanborn, and for the purpose of compelling said W. A. Currier to pay said note, when in equity and good conscience he ought not to pay any part thereof.

On or about the first day of November 1861, the said W. A. Currier, being threatened with a suit upon the one of said notes falling due on that day, paid the same with the costs thereon to said Perkins, or his attorneys, to prevent said suit.

On the 22d day of May, 1862, the plaintiffs made a demand in writing upon the said Webster and Sanborn and said Rowe, for a just and true account of all their demands secured by any and all mortgages upon said premises, and of all damages and costs incurred, and of all rents and profits received therefrom. And on the 6th day of June, A. D. 1862, said Webster and Sanborn made their return in writing, setting forth the assignment from said Perkins to them of his said mortgage, and also that said Rowe, being mortgagee in a second mortgage, had released and quitclaimed all his interest in said premises to them; and said Rowe certifies that said statement, so far as he is concerned therein, is true, and said parties annex the following as a just and true account of their claim, to wit:

1861, Nov. 20, To paid George R. Perkins for assignment
          of mortgage, &c.          $440 36

|  |  |
|---|---:|
| Half expense of conveyances $1, recording 42 | 1 42 |
| Ames Sheriff, service of writ of possession | 5 04 |
| Taxes (in part) | 2 80 |
| Interest on above to date | 14 83 |
| Trouble and expense in going to Peterboro' and Sharon, 5 days in all at $2 each, including expenses | 20 00 |
| Horse and wagon and expenses | 7 50 |
| Dearborn and Scott counsel in Cheshire Co. say | 12 00 |
| Tuck and French counsel, say | 10 00 |
| Sundry correspondence and postage | 4 00 |
|  | $517 95 |
| Cr. 1862, May 24, By cash received for rent of mill by George R. Perkins | 20 00 |
| Balance due mortgagees | $597 95 |

And the said plaintiffs aver that said account is not just and true, but is false and untrue. And said W. A. Currier says that he has paid his full share and proportion of the amount due upon said mortgage and has done all that, in equity and good conscience, he ought to be compelled to do ; but both of said plaintiffs are ready and willing to pay whatever sum may be justly and legally due from them.

And they further aver that they believe the said Webster and Sanborn are prosecuting the said suit for the purpose of compelling the plaintiffs or said R. W. Currier to pay the same, in order that they may obtain said premises for a trifling and greatly inadequate consideration, and, by completing the foreclosure of said mortgage, defraud said plaintiffs of their money and rights.

And they further aver that the said assignment and conveyances from said Perkins to said Webster and Sanborn were made by the procurement of said Rowe, and, with the conveyance from said Rowe to said Webster and Sanborn, were made by said parties for the purpose of defeating and embarrassing said W. A. Currier in the prosecution of his rights in the premises.

And they further aver that they are unable to ascertain what rights, if any, said Webster and Sanborn, or either of said defendants, claim by virtue of the said several conveyances and assignments, and pray that they may disclose the same, and whether said Perkins or said Rowe now have or claim any interest in said premises, and, if any, what.

Wherefore they pray that an injunction may issue to restrain said Perkins, or said Webster and Sanborn, in his name from further prosecuting his said suit in Cheshire county, and from levying or collecting of the plaintiffs or said R. W. Currier, any execution which may have been, or shall be, issued in said suit, during the pendency of this bill, and until the final decision of the matters therein contained ; that the foreclosure of the said Perkins' mortgage may be stayed, that the amount justly due

upon said mortgage may be determined, that the plaintiffs may bring the same into court, if bound so to do, and have said mortgage discharged, or that said Rowe or said Webster and Sanborn may be decreed to contribute their proportion of the same, as their respective rights may be, and for such other relief as may be just.

The bill was taken *pro confesso* as to Rowe and Perkins.    Webster and Sanborn have filed an answer in which they admit that John W. Currier and Rowe were seized of the premises in question on or about October 12th, 1859, and that they conveyed to Snow as stated in the bill.    They then state the other proceedings by Perkins, by which he obtained possession of the premises, and the sale by him to Sanborn and Webster, and their possession since ; that plaintiffs made a demand on them for an account, and that they rendered an account as stated in the bill.    They aver that said account was just and true, and explain the mistake in the footing, and allege that the sum thus due has not been paid or tendered to them, and that the right to redeem said premises has thus been forever foreclosed, and the plaintiffs have now no right to redeem.    They deny any attempt, on their part, to injure or defraud or embarrass the plaintiffs.

The cause was heard upon the bill, answer, and proofs.

*Bell*, for plaintiffs.

*Tuck* and *Stickney*, for Webster & Sanborn.

SARGENT, J.   Revised Statutes, chap. 131, secs. 8 and 9, provide that " the mortgagee, upon a request in writing by the mortgager, shall make out and deliver to him or his agent a just and true account of all his demands secured by such mortgage and all damages and costs incurred by reason of the non-performance of the condition thereof, and of all rents and profits by him received."   If he shall unreasonably refuse or neglect to make out and deliver such account, the Court of Common Pleas, upon petition by the mortgager setting forth the facts in the case, and due notice given to the parties interested, shall determine the amount justly due, after deducting rents and profits received.

The defendants contend, 1st—that, as the jurisdiction of the Court of Common Pleas was transferred to the Supreme Judicial Court at its trial terms, by the act of 1859, the plaintiffs' only remedy was to file a petition in the trial term of this court, if an account was not properly rendered upon demand, and that this bill cannot be maintained, and could not be, whether the account were rendered or not ; and, 2nd, that in this case a just and true account was seasonably rendered upon demand, and, as plaintiffs have not paid the amount due, and the year has expired, that the said Webster and Sanborn have held possession under their writ of possession, that therefore the mortgage is foreclosed and that plaintiffs have now no remedy.

The statute above cited is substantially the same as the statute of 1829, (N. H. Laws of 1830, 486—7,) with this   change, that the law formerly provided that the petition should be to the justices of the Superi-

or Court instead of to the Court of Common Pleas, as in the Revised Statutes. But by the law of 1834 it was provided that "the Superior Court of judicature shall have chancery powers and jurisdiction in all cases respecting the redemption and foreclosure of mortgages, *   *   * And the powers and jurisdiction thus vested in the Superior Court shall be exercised according to the established principles of chancery as far as shall be consistent with the laws and constitution of this State."

It was held, in *Wendell* v. *The N. H. Bank*, 9 N. H. 404, that this remedy in chancery was given as a cumulative remedy, and that a party might proceed in either way, under the statute of 1829, which is there construed and explained, or by bill in chancery, in which the usual course in courts of chancery may be pursued, as far as the statutes have not provided specially; but that, wherever the act of 1829 was applicable, it must govern the substance, but not the form, of proceeding. Now we have seen that the only change in the statute of 1829, at the revision in 1842, was the change in the court to which the petition of the mortgagee should be addressed. And in the Revised Statutes it is also provided, chap. 171, sec. 6, that the Superior Court " shall have power to hear and determine, as a court of equity, in cases respecting the redemption and foreclosure of mortgages"; which power was transferred to the Supreme Judicial Court by the act of 1855 remodelling the judiciary. Both remedies being thus continued in the Revised Statutes as before, we conclude that it was not intended substantially to change the law, but to leave the remedy in equity, as well as by petition under the statute, as it existed when *Wendell* v. *The N. H. Bank* was decided.

Section 8 of chap. 131 Rev. Stats., above quoted, provides, that, upon request, the mortgagee shall make out and deliver a *just and true* account; and section 9 provides, that, if the mortgagee shall unreasonably refuse or neglect to make out and deliver *such* account, &c. Now, it is held, in *Wendell* v. *The N. H. Bank*, 9 N. H. 416, that, in order to justify the filing of the petition under the law of 1859, there must be either an unreasonable refusal or neglect to make out the account, or the account rendered must be erroneous, and that, in either of these cases, the mortgager, or party having his right, may either file his petition under the law of 1829 or bring his bill in chancery under the law of 1834, as he may elect. And, as the laws remain now substantially as they were then, the same rule will apply to this case.

How then does this case stand? It is not alleged that here was any unreasonable delay in making out and delivering the account, but it is alleged that the account rendered was erroneous, that it was not just and true, and we think that this allegation is well founded. We do not regard the error in the footing of the sum claimed as material. Though it appears a hundred dollars too large, yet, the items being all given, the computation is easy, and the error is so plain that no one could be misled by it. Had a tender been attempted, we should, of course, hold that all that was necessary was to tender the amount shown to be due by a correct computation. If it had been a mistake by which the plaintiffs could easily, and would have been likely to, have been misled, then the burden of the mistake should fall upon those who make it. But, in

a case like this, we think the error was so plain and evident a mistake, and one so patent upon the face of the account, that it should not be held to have any effect whatever.

But, supposing the first items in the account (excepting the charge for recording) to be correctly stated and sufficiently definite the last five are evidently either improperly charged, or are not properly stated. The 6th, 7th and 10th items are, we think, improper matters to be charged at all. And though, perhaps, the 8th and 9th items might be proper charges to make, either in whole or in part, yet it is evident, from the manner in which they are stated, that these sums or any sums had not been paid; and that the mortgagees did not know what the bill of their counsel would be, at the time the account was made out, but that these were mere estimates of what their bills might be, without any definite knowledge upon the subject. This is not sufficient.

If these plaintiffs had tendered the amount of the first five items, less the charge for recording, we should probably have held that sufficient. *Duncklee* v. *Gay*, 39 N. H. 242. But they must, in that case, tender enough upon their peril and rely upon that; and if it proved insufficient, lose the land. And we think they were not called upon to run that risk. The account was so clearly erroneous upon its face, that they might safely have petitioned the court under section 9 of chap. 131, or, if they chose, bring their bill in equity to ascertain the just and true amount which they must pay in order to redeem. The bill in equity can, therefore, be maintained. Nor can the defence, stated in the answer, that a just and true account was seasonably rendered, be maintained.

The bill charges that the conveyances to Webster and Sanborn were made by the procurement of Rowe, and for the purpose of defeating and embarrassing said W. A. Currier in the prosecution of his rights in the premises. Webster and Sanborn deny any such wrong intent on their part; but it appears from the evidence that they were induced to purchase the mortgage by Rowe, and that he was the active man in bringing about the whole arrangement between the several parties; and he, by failing to answer, has admitted all the allegations in the bill. It may, therefore, be assumed that Rowe's purpose was to get the property in such a shape and condition as to injure and embarrass his former partners, these plaintiffs, as much as possible, and that he has not only done, but intended to do, all he could to accomplish this object.

But there are some facts stated in the bill which are not attempted to be answered by anybody and which are not met by the evidence. It is alleged, that, when the Curriers and Rowe first purchased this land and mill, it was stipulated and agreed between the three, that each should pay an equal share of the consideration therefor, and that each should have an equal interest in said property and in the proceeds arising from the working of said mill, and it is afterwards alleged that the profits of said premises were to be for their joint benefit in equal shares. This is not denied by anybody, and is therefore to be taken as admitted. Now, although it is distinctly alleged that the profits of these premises and the working of the same were to go into a partnership, it being for their "joint benefit in equal shares," yet it does not distinctly appear whether

the farm, when paid for in equal shares by each, was to be the property of the partnership, or whether the partners were to be tenants in common, of one-third each.    The allegation that each was to have an equal interest in the property might be true in either case.    But, whatever the arrangement may have been in regard to the ownership of the land and mills, whether it was to be owned by them equally but individually as tenants in common of one-third each, or by them equally as partners in a company in which each owned and had paid for an equal share of the stock and was to have an equal share of the profits, is not material here to settle, though we might infer from the whole bill that it was the latter—that the land and mills were the capital which belonged to the company as such, and was to be held, like the profits, by them "jointly in equal shares."

But, however this may have been, it is evident that there was no partnership before the land and mills were purchased.    But when that purchase was made, "each was to pay an equal share of the consideration therefor."    If there had been a partnership existing before between these men, then this expression might possibly be liable to the double construction before mentioned, that each should pay his share jointly with the rest, which might be done out of partnership funds, or that each should pay his share individually from his private funds.    But, as there was no partnership before, and each was to pay an equal share of the consideration therefor, we conclude that each was to pay out of his own individual funds.    This bill does not ask for a dissolution of the partnership, or a settlement of the partnership accounts, and does not interfere with the partnership affairs at all, but is brought to ascertain the amount justly due upon the mortgage which was given to secure notes for a portion of the purchase money paid for the land and mills, which notes were signed by the three, but which were to be paid in equal proportions by each of the signers, in their individual, and not in their partnership, capacity.

The defendants contend that this sum due to Perkins was a partnership debt, and that therefore it must be adjusted with the other debts of the company, and cannot be inquired into here.    But the note was not signed as a company note, but by each of the three partners individually. Of course, each was liable to the payee for the whole of each note ; but if the contract was that each should pay for his third part, as it appears they did for the balance of the farm, then, if either of the Curriers paid the whole, he could recover at law the share of Rowe thus paid by him, on the ground that this was money that each partner agreed to pay a certain proportion of, in order to commence or *launch* the partnership ; in order to constitute the amount of capital agreed on before commencing the company.

It would be one of those cases noticed by Story in 1 Equity Jurispr. sec. 665, in which suits at law have been maintained for the breach of an agreement to furnish a certain sum or stock for the partnership purposes.    In such a case, he says the transaction is not so much a partnership transaction as an agreement to launch the partnership, and an agreement to pay money or furnish stock for such a purpose, is an indi-

vidual engagement of each partner to the other; and, for the breach of such an agreement, there seems no reasonable objection to the maintenance of a suit at law. *Glover* v. *Tuck*, 24 Wend. 153, 158; Coll. on Part. 132; *Townsend* v. *Goewey*, 19 Wend. 424, and cases cited; *Radenhurst* v. *Bates*, 3 Bing. 463; *Gale* v. *Leckie*, 2 Stark. 107; *Venning* v. *Leckie*, 13 East, 7. This, then, being a matter outside the partnership affairs, may be properly adjusted in this proceeding.

Before Snow paid the fifty dollars on one of the notes to Perkins,there were three notes of $200 each remaining due him, one of which it belonged to each of the Curriers,and the other to Rowe,to pay,according to the arrangement between the parties. Snow, then, paid fifty dollars which was for the benefit of each of the three equally. Then the costs, that have been, or are to be, paid on all these notes, should be paid equally by the three. When the whole amount of costs is ascertained, let the three notes of $200 each be cast, deducting the fifty dollars paid by Snow, then add the whole amount of costs on all, with the amount of taxes paid, with interest on the same from the time of payment, then deduct all rents on the premises, and the balance divided by three will give the amount that each should pay. Then cast interest on the whole amount paid by W. A. Currier as debt and costs, and that will show whether he has already paid less or more than his just proportion; and whether he has paid too little or too much can be arranged with the other plaintiff. Such division by three also gives the share which Rowe is to pay. After this is determined, let the plaintiffs bring into court what remains due of debt and costs, after deducting Rowe's full third, and also after deducting what W. A. Currier has paid,with interest,as above; and thereupon let the mortgage be discharged and a decree entered accordingly. Also let Rowe indorse on the notes he holds against Webster and Sanborn, the amount that belongs to him to pay upon the mortgage, as it appears that Webster and Sanborn are now owing said Rowe by note some $1500, which note was given by them, upon the purchase of his farm and personal property. That will dispose of the mortgage. Rowe will be made to contribute his proportion of the mortgage debt, and Webster and Sanborn will in that way receive the whole amount of their mortgage debt, either in money or by indorsement upon their own notes, which, of course, is equivalent to cash to them.

It appears that Rowe also conveyed by quitclaim to Webster and Sanborn, all his right, title and interest in and to the premises in question on the 20th Nov. 1861, at the same time that Perkins conveyed his interest to them. But, before this, Rowe and the Curriers had conveyed to Snow, and had taken back a mortgage from him to themselves to secure a note or notes for $1000. Rowe, having parted with his title in fee,only held as mortgagee at this time, and had not entered to foreclose, and a quitclaim or assignment of his interest in the land, without any sale, assignment, or delivery of the notes secured by the mortgage, would convey no interest whatever in the land. *Smith* v. *Smith*, 15 N. H. 55; *Weeks* v. *Eaton*, 15 N. H. 145; *Great Falls Co.* v. *Worster*, 15 N. H. 412; *Furbush* v. *Goodwin*, 25 N. H. 425; *Lamprey* v. *Nudd*, 29 N. H. 299.

The only trouble that could possibly arise would be, that, if hereafter the mortgage against Snow should be foreclosed so as to bring any title to this land into the hands of Rowe, he might be stopped to claim it, as against Webster and Sanborn, by this deed, though that would be a doubtful question. But, in order that this deed may not operate as a cloud upon the title, or in any other way, let the same be rescinded and decreed null and void to all intents and purposes, as it could have been given for no honest purpose on the part of Rowe, whatever the purpose of Webster and Sanborn may have been, and let said Webster and Sanborn be allowed the sum of $50, which was the consideration of the deed on the notes which Rowe holds against them, with interest from the date of the deed. This will do justice between all the parties. Webster and Sanborn would not want to retain this deed, after the mortgage which they received from Perkins was discharged, and it would probably be entirely unavailable to them if they did; and if they can get back the money which they paid for a void deed they will be fortunate, and we think it right, in this case, that they should, as it can be drawn from the funds of Rowe in their hands, without difficulty or circumlocution. Then the affairs of the partnership can probably be closed up without difficulty, after Webster and Sanborn and Perkins are separated from all connection with them.

Probably, upon these suggestions, the parties may be able to arrange the whole matter among themselves; but, lest they should not do so, let a Master be appointed to ascertain the amount due upon the mortgage according to the foregoing directions. He will allow to Webster and Sanborn the amount of costs properly paid to Dearborn & Scott in the suit brought by them on one of the notes secured by this mortgage. The evidence tends to show that the bill paid to Tuck and French by defendants, was for counsel fees in this suit, and not in any suit upon any note secured by the mortgage in question. If that is so, then no part of it can be allowed to the defendants. In ascertaining the amount of rents for which Webster and Sanborn should be charged, the Master will inquire what rents have been received by them and also what rents they ought to allow, if any, for the property while in their possession and not rented to others.

When the Master makes his report, the plaintiffs will bring into court the amount thus indicated for them to pay, whereupon the proper orders will be made and decrees entered.

In this proceeding the plaintiffs will be entitled to full costs against Rowe, Webster and Sanborn. Perkins will be discharged without costs.

*Master appointed.*